**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD J. N.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 20 C 245** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Richard J. N. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying in part his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment seeking to affirm the decision. After careful review of the record and the parties' respective arguments, the Court finds that though much of the decision is supported by substantial evidence, the case must be remanded for further proceedings.

## BACKGROUND

Plaintiff applied for DIB and SSI on July 31, 2014, alleging in both applications that he became disabled on March 5, 2013 due to ulcerative colitis, Crohn's disease, weak

---

[1]    Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

bones, hypercalcemia, hypothyroidism, and peripheral neuropathy.  (R. 425, 427, 520).[2]

Born in 1965, Plaintiff was almost 49 years old at the time of his applications, making him a younger person soon to be a person closely approaching advanced age (age 50-54). (R. 425, 427); 20 C.F.R. § 404.1563(c) and (d); 20 C.F.R. § 416.963(c) and (d).  He has a 12th grade education and lives with his mother.  (R. 64, 521).  Between December 1998 and January 2009, Plaintiff worked as an electrician's assistant, a dock worker, a welder, and a sheet metal worker.  (R. 278, 521).  He was laid off from his sheet metal job on May 31, 2009 and says that a year later he became unable to work due to his impairments. (R. 520).

The Social Security Administration denied Plaintiff's applications initially on December 1, 2014, and again upon reconsideration on May 29, 2015.  (R. 142-195). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Diane S. Davis (the "ALJ") on November 8, 2016.  (R. 45).  The ALJ heard testimony from Plaintiff, who was represented by counsel, and from a vocational expert ("VE") Ronald Malik.  (R. 47-88).  On January 17, 2017, the ALJ issued a partially favorable decision. Prior to August 12, 2015, Plaintiff had the residual functional capacity ("RFC") for light work despite his severe impairments of ulcerative colitis, Crohn's disease, degenerative disc disease of the lumbar spine, and diabetic peripheral neuropathy.  (R. 246-50).  The VE testified that a person with Plaintiff's background could perform a significant number of jobs available in the national economy, and so the ALJ found him not disabled during

---

[2]     Plaintiff had filed prior applications for disability benefits in November 2011 (alleging a January 30, 2009 disability onset date) that were denied by an administrative law judge on March 4, 2013.  (R. 199-208).  The parties agree that since Plaintiff did not appeal that decision, the relevant period at issue here begins March 5, 2013 rather than May 25, 2010 as stated in the July 2014 applications.  (R. 267; Doc. 18, at 1 n.2; Doc. 25, at 3-4).

that period. (R. 253-54). Beginning on August 12, 2015, however, Plaintiff developed new impairments, a massive rotator cuff tear of the left shoulder and osteopenia, that limited him to performing sedentary work. (R. 250-52). With this new RFC, Plaintiff was disabled under the Medical-Vocational Guidelines. (R. 254). Plaintiff appealed the decision, in part because his date last insured ("DLI") for purposes of DIB benefits was September 30, 2014. (R. 18).

On November 29, 2017, the Appeals Council affirmed the ALJ's finding that Plaintiff was disabled as of August 12, 2015, but remanded the case for a supplemental hearing and decision on whether Plaintiff was also disabled from March 5, 2013 through August 11, 2015. (R. 261-62). The Appeals Council instructed the ALJ to "specify the frequency and duration of necessary restroom visits so as to determine the extent to which the claimant would be off-task during an eight hour workday." (R. 261). At the new hearing on August 8, 2018, the ALJ heard testimony from Plaintiff, who was once again represented by counsel, and from VE Gary P. Wilhelm. (R. 13-44, 611). On August 30, 2018, the ALJ once again found that Plaintiff's ulcerative colitis, Crohn's disease, degenerative disc disease of the lumbar spine, and peripheral neuropathy are severe impairments, but that they did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, between March 5, 2013 and August 12, 2015. (R. 270-72).

After reviewing the evidence, the ALJ concluded that prior to August 12, 2015, Plaintiff retained the RFC to perform light work as follows: occasional lifting and carrying of 20 pounds; frequent lifting and carrying of 10 pounds; sitting, standing, and walking for about 6 hours in an 8-hour workday; frequent balancing, stooping, and climbing ramps

and stairs; occasional kneeling, crouching and crawling; no climbing of ladders, ropes, or scaffolds; and occasional exposure to temperature extremes and vibrations. Plaintiff would also require one extra unscheduled break of 10 minutes each day, outside the normal morning, afternoon, and lunch breaks. (R. 272-78). The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could perform a significant number of jobs available in the national economy and so again found Plaintiff not disabled prior to August 12, 2015.[3] (R. 279-80). On November 14, 2019, the Appeals Council affirmed the ALJ's findings for the period prior to August 12, 2015 (and upheld the earlier determination that he was disabled thereafter). (R. 1-6). That decision stands as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. §§ 405(g) and 1383(c)(3). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of his request for reversal or remand, Plaintiff argues that the Appeals Council: (1) erred in assessing his need for bathroom breaks; (2) failed to give proper weight to the opinions from his treating physician Timothy Brandt, M.D.; (3) improperly evaluated his statements regarding the limiting effects of his symptoms; and (4) erred in finding that there were a significant number of jobs that Plaintiff could perform with his background and RFC. For the reasons discussed below, this Court agrees with Plaintiff that the case must be remanded for further consideration of his subjective statements regarding musculoskeletal pain.

---

[3]     The ALJ expressly noted on the first page of the decision that the period in question was March 5, 2013 through August 11, 2015 (R. 267), but elsewhere she mistakenly stated that Plaintiff was not disabled "through the date of this decision," or August 30, 2018. (R. 280). The Court agrees with the parties that this was essentially a scrivener's error. (Doc. 25, at 4; Doc. 18, at 2).

**DISCUSSION**

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019).  The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'"  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex*

*rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI, a claimant must establish that he is disabled within the meaning of the Social Security Act.[4]   *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016).   A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   20 C.F.R. §§ 404.1505(a).   In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).   If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five.   *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

---

[4]    Because the regulations governing DIB and SSI are substantially identical, for ease of reference, only the DIB regulations are cited herein.

**C.     Analysis**

**1.     Bathroom Breaks**

Plaintiff argues that the case must be reversed or remanded because the Appeals Council erred in finding that between March 5, 2013 and August 12, 2015, he "would require on[e] extra unscheduled break of 10 minutes each day outside of normal morning, afternoon, and lunch breaks." (R. 6). In making this determination, the Appeals Council adopted "the reasons given in the [ALJ's] decision," so the relevant question is whether the ALJ's reasoning is supported by substantial evidence. A claimant's RFC is the maximum work that he can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct h[er] own RFC finding without a proper medical ground and must explain how [s]he has reached h[er] conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). *See also Ana M.A.A. v. Kijakazi*, No. 19 C 7559, 2021 WL 3930103, at *2 (N.D. Ill. Sept. 2, 2021).

The ALJ found that Plaintiff's ulcerative colitis and Crohn's disease were accommodated by a single extra unscheduled 10-minute break each day because he made only "intermittent complaints of incontinence or diarrhea, with no specialized treatment." (R. 276). Plaintiff was first diagnosed with ulcerative colitis ("UC") in 2010 (R. 1243), and by March 2011 his records started documenting a history of Crohn's disease. (R. 683). On August 28, 2012, Plaintiff had a colonoscopy that showed his entire colon was "notably inflamed with evidence of granularity, edema, and small, ulcerations." (R. 273, 1057). The doctor had to terminate the procedure after going in 90

centimeters secondary to patient tolerance and inflammation.  (*Id.*).  On October 25, 2012, Plaintiff reported to the Adventist La Grange Memorial Hospital Emergency Department ("Adventist ED") with abdominal pain and complaints of diarrhea 7-10 times per day and bloody stools for two weeks.  (R. 668).  He was diagnosed with abdominal pain, an umbilical hernia, and a history of UC, and was discharged with a prescription for prednisone.  (R. 671-72).

Plaintiff went to see family medicine specialist Nasreen Ansari, M.D. on April 1, 2013 (shortly after the relevant March 12, 2013 alleged disability onset date), with complaints of fatigue, abdominal pain, and diarrhea.  On exam, his abdomen was soft with normal bowel sounds, no distension, and no tenderness.  (R. 744).  Dr. Ansari diagnosed UC and noted that Plaintiff's medications included prednisone, Remicade, Asacol, and azathioprine.  (R. 744-45).  Follow-up abdominal exams with Dr. Ansari on April 24, 2013 and May 22, 2013 were again normal.  (R. 747-48, 751).  Plaintiff reported that he was seeing a specialist at the John H. Stroger Hospital of Cook County for his UC but there are no associated treatment notes in the record.  (R. 749).  Plaintiff once again denied having abdominal pain when he went to the Adventist ED on June 20, 2013 due to a rib fracture.  (R. 273, 663-65).

Four days later, on June 24, 2013, Plaintiff started treating with internist Timothy Brandt, M.D.  (R. 1081).  Dr. Brandt diagnosed Plaintiff with UC and Crohn's disease but his handwritten notes are otherwise illegible.  (*Id.*).  Plaintiff continued to see Dr. Brandt every month through December 2015, attending some 29 appointments.  Dr. Brandt routinely prescribed Norco, Soma, and Xanax, but the rest of his treatment notes are illegible.  (R. 1081-89).

In the meantime, Plaintiff pursued treatment for other medical problems, primarily chronic low back, knee, and leg pain. Plaintiff sometimes complained of bowel issues at those encounters but not always, and abdominal exams were routinely normal. On September 26 and October 31, 2013, for example, Plaintiff told Dr. Ansari that he had no abdominal pain or blood in his stool, and his abdominal exams were normal. (R. 757-58, 760). The same was true at exams performed in January and April 2014. (R. 273, 652, 819-20). On June 9, 2014, Plaintiff told Ursula Garcia, APN that he had been feeling bloated for the past few days, was experiencing abdominal pain, and was going to see the gastroenterologist later that week.[5] Nurse Garcia noted distension of Plaintiff's abdomen due to an umbilical hernia. (R. 777). Dr. Brandt's subsequent July 9, 2014 treatment note does not appear to include any medication adjustments or a referral to a gastroenterologist. (R. 1083).

At a July 2, 2014 neurosurgery consultation, Plaintiff reported "few episodes of diarrhea" due to inflammatory bowel disease ("IBD") and complained of abdominal pain from the umbilical hernia. (R. 274, 810). Plaintiff presented with abdominal pain and mild distension during an appointment with Nurse Garcia on August 11, 2014, but he exhibited no tenderness and made no complaints of constipation or blood in the stool. (R. 781). A few days later, on August 15, 2014, Plaintiff told pain management specialist Troy Buck, M.D. that he suffered from bowel incontinence related to Crohn's disease. (R. 801). When Plaintiff next saw Nurse Garcia on November 10, 2014, he once again complained of frequent bowel movements and abdominal distension. (R. 839). He had a hernia repair in January 2015 and reported no abdominal pain to Nurse Garcia on February 24, 2015.

---

[5]    It appears that when Plaintiff referred to his "gastroenterologist," he meant internist Dr. Brandt. (R. 34).

(R. 274, 898, 927). The pain returned on June 17, 2015, with Plaintiff complaining of intermittent diarrhea, abdominal pain, and incontinence upon bending over. (R. 275, 948).

The ALJ discussed these medical records in detail and reasonably noted that in addition to the "mostly intact objective findings," Plaintiff required only conservative treatment. (R. 275). Aside from the January 2015 hernia repair, Plaintiff had no other surgeries during the relevant period. He also never sought treatment from, or received a referral to, a gastroenterologist, suggesting that his condition did not require specialized care. (*Id*.). After August 2012, Plaintiff never had another colonoscopy during the relevant period, nor did he undergo imaging of his abdomen or pelvis. The record also contains no pertinent stool samples or ED reports reflecting that Plaintiff sought emergency treatment for his UC or Crohn's disease during the relevant period. (*Id*.).

Plaintiff largely ignores evidence of his normal exams and conservative treatment during the period at issue and focuses on records that predate the March 5, 2013 alleged disability onset date. (Doc. 18, at 8-9). For example, Plaintiff cites: a May 2010 visit to the emergency department ("ED") with bloody stools; a May 2010 colonoscopy showing moderate to severe UC (R. 1238); complaints of daily frequent bloody bowel movements in December 2010 (R. 691); a December 2010 CT scan showing mild diffuse hepatic fatty infiltration and moderate adrenal atrophy probably due to steroid therapy (R. 699-700); a March 2011 visit to the ED with abdominal pain and a Crohn's "flare-up" (R. 678-79); the August 2012 colonoscopy showing notable inflammation with evidence of granularity, edema, and small ulceration (R. 1057); and an October 2012 ED visit due to abdominal pain and diarrhea (R. 668-71).

Plaintiff skips over the following two years of records and jumps to November 2014 when he complained to Nurse Garcia of "episodes of diarrhea." (R. 838). But Plaintiff's next complaint of intermittent diarrhea and fecal incontinence was not until seven months later in June 2015. (R. 948). Two months after that on August 12, 2015, Plaintiff became eligible for disability benefits. Plaintiff fails to explain how these treatment notes demonstrate that he needed more than one extra unscheduled 10-minute break each day from May 5, 2013 through August 11, 2015.

The ALJ also addressed Plaintiff's testimony and provided good reasons for discounting his statements regarding the frequency and severity of his UC and Crohn's disease. The regulations describe a two-step process for evaluating a claimant's own description of her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2. If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id*. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Court is to give the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong," i.e., if it "lacks any explanation or support." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)

(internal quotations omitted); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is "patently wrong." *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018).

The ALJ acknowledged Plaintiff's testimony that in 2013 and 2014 he had random daily episodes of fecal incontinence and frequent accidents. (R. 272). But there is no evidence that Plaintiff complained to his treaters about accidents or requested help controlling his fecal incontinence beyond seeing internist Dr. Brandt, who simply prescribed medication. Plaintiff also never reported needing to stay home to be close to a toilet, waking up in the middle of the night with diarrhea, or having only 10 seconds of warning before a bowel movement as he claimed in his September 24, 2014 Function Report. (R. 546, 548). In the absence of such complaints, the ALJ did not err in discounting Plaintiff's testimony that he needed to be close to a toilet at all times and had frequent accidents.

Plaintiff responds by once again pointing to evidence well outside the relevant period. (Doc. 18, at 10). For example, he notes that on the morning of the August 8, 2018 administrative hearing, he had to run to the bathroom after taking a bite of a banana. He used the bathroom again just prior to the hearing, needed to take a break during the hearing, and had three accidents and soiled himself the day before the hearing. (R. 25-26). Though Plaintiff testified that he had accidents in the waiting room of gastroenterologist Andrew Kim, M.D. at some unspecified time (R. 28-29), the only notes referencing Dr. Kim are from the August 2012 colonoscopy and a prescription list

identifying him as a provider up through August 2012. (R. 596, 1057). None of these records reflect Plaintiff's functioning from March 5, 2013 through August 11, 2015, and as stated, treatment notes from the relevant period do not reflect any similar complaints of accidents. On the record presented, the ALJ's decision to discount Plaintiff's testimony regarding the frequency and severity of his diarrhea and fecal incontinence was not patently wrong.

Finally, the ALJ provided good reasons for rejecting the opinions from Dr. Brandt and Nurse Garcia that Plaintiff experienced frequent diarrhea and fecal incontinence that would preclude all work activity. A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); see *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from

a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); see *Simila*, 573 F.3d at 515.

On September 17, 2014, Dr. Brandt prepared a typewritten letter opining that Plaintiff's "condition involves frequent and unpredictable diarrhea, often with loss of control, making activities in public settings, such as the work place, inconvenient and embarrassing." (R. 830). The ALJ gave this opinion no weight because it was "vague and inconsistent with the medical records," which routinely showed "normal abdominal findings" except for an umbilical hernia. (R. 277). Dr. Brandt never referred Plaintiff to a gastroenterologist for specialized care (R. 275), and treatment notes show that the only prescription Dr. Brandt regularly provided for Crohn's and UC was Xanax.[6] (R. 1081-89). Notably, Plaintiff does not identify any records from Dr. Brandt or any other physician that support his opinion regarding frequent, unpredictable diarrhea with loss of control. The ALJ also observed that Dr. Brandt appeared to rely "quite heavily on the subjective symptoms and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what [Plaintiff] reported." (R. 277). As the ALJ explained, however, there were good reasons for questioning the reliability of Plaintiff's subjective statements, including the intermittent nature of his complaints, the lack of any specialized treatment, and the mostly normal abdominal exams. (R. 275-76, 277). For reasons stated, that decision was not patently wrong.

As for Nurse Garcia, on February 6, 2018 she completed a questionnaire stating that Plaintiff has to use the bathroom at least three times a day, and over 8-10 times during a flare. (R. 1258). He also experiences acute exacerbations of his IBD that causes

---

[6] Dr. Brandt also prescribed the pain killers Norco and Soma; all other handwritten notes are illegible.

increased pain and increased bathroom use, as well as fecal incontinence. (R. 1259). In assigning this opinion no weight, the ALJ first observed that Nurse Garcia is not an acceptable medical source. (R. 277). *See Sosh v. Saul*, 818 F. App'x 542, 547 (7th Cir. 2020) (nurse practitioner was not an acceptable medical source). The ALJ also found Nurse Garcia's statements inconsistent with the objective medical record, again noting Plaintiff's intermittent complaints, lack of specialized treatment, and mostly normal abdominal exams. (R. 275-76, 277). And as with Dr. Brandt, Nurse Garcia based her opinion "quite heavily" on Plaintiff's subjective complaints that were not fully reliable. (R. 277). Notably, Nurse Garcia indicated that she did not start treating Plaintiff for IBD until July 2016, nearly a year after the August 12, 2015 ending date for considering Plaintiff's appeal. (R. 5, 1258).

Plaintiff notes that the ALJ also gave no weight to the opinions from the State agency consultants that Plaintiff did not need any additional breaks at all to accommodate his UC and Crohn's disease (R. 146-47, 155-56, 177-79, 189-91, 276-77), and argues that the ALJ played doctor when she included one break in the RFC when no physician opined that such a restriction was sufficient. (Doc. 18, at 7). The Court disagrees. The ALJ acknowledged that Plaintiff did complain at times of diarrhea, and twice reported fecal incontinence (once on August 15, 2014 to pain management specialist Dr. Buck, and once on June 17, 2015 to Nurse Garcia). (R. 275, 801, 948). Based on that testimony, and in light of the medical evidence, the ALJ reasonably determined that one additional unscheduled 10-minute break each day was appropriate. *See Schmidt*, 496 F.3d at 845 (in determining a claimant's RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians.").

Plaintiff also objects that the ALJ failed to provide a narrative discussion explaining her decision that no additional or longer breaks were necessary. (Doc. 18, at 5-6; Doc. 27, at 1, 2, 5-6) (citing SSR 96-8p, 1996 WL 374184, at *7). As discussed, however, the ALJ properly considered all of the pertinent medical and testimonial evidence of record and explained why it was inconsistent with a need for more than one additional break each day. Since the Court is able to trace the ALJ's reasoning regarding a bathroom break accommodation, she has sufficiently built a logical bridge between the evidence and her conclusion. *Charles M. v. Comm'r of Soc. Sec.*, No. 19-CV-1178-JES-JEH, 2021 WL 779979, at *3 (C.D. Ill. Mar. 1, 2021) ("The ALJ need not draft a novel to explain her reasoning. She must minimally articulate it, such that a reviewing court can trace her reasoning and her decision can be subjected to meaningful review."). *See also Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154 ("Substantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

Viewing the record as a whole, the ALJ did not commit reversible error in finding that from March 5, 2013 through August 11, 2015, Plaintiff needed one additional unscheduled 10-minute break per day to accommodate his UC and Crohn's disease. Plaintiff's request to remand the case for further explanation of this issue is denied.

## 2. Dr. Brandt's Opinion

Plaintiff next argues that the case must be reversed or remanded because the Appeals Council wrongly adopted the ALJ's decision to give no weight to Dr. Brandt's opinion. (Doc. 18, at 11-16; Doc. 27, at 6-11). The Court already determined that the ALJ reasonably rejected the opinion from Dr. Brandt as it relates to Plaintiff's need for

bathroom breaks. The question here is whether the ALJ fairly discounted his opinions concerning Plaintiff's musculoskeletal pain, medication side-effects, and weakened bones.

In his September 17, 2014 letter, Dr. Brandt stated that Plaintiff suffers from "painful osteoporosis" due to the steroids he takes to control his Crohn's disease and UC. (R. 830). The pain requires use of mild narcotic pain relievers, "which themselves can cloud mentation and level of alertness." (*Id*.). In addition, the weakened bone caused by osteoporosis "is prone toward pathological fractures, making physical work dangerous." (*Id*.). Based on these concerns, Dr. Brandt recommended that Plaintiff be restricted from regular employment. (*Id*.).

In rejecting this opinion, the ALJ first explained that it was "vague and inconsistent with the medical records." (R. 277). The Appeals Council agreed that the opinion was "too vague to be particularly useful. (R. 5). Plaintiff concedes that the ALJ discussed the medical findings, which were sometimes normal and sometimes abnormal, but he argues that the ALJ failed to build a logical bridge between that evidence and her decision to reject Dr. Brandt's opinion. (Doc. 18, at 13; Doc. 27, at 8). But Plaintiff does not cite any specific medical record that he believes supports Dr. Brandt's conclusion that he was incapable of working during the relevant period. Dr. Brandt did not provide an opinion as to Plaintiff's ability to perform functional activities due to his back, leg, foot, and shoulder pain. The closest he came was a general statement that Plaintiff's steroid use caused painful osteoporosis. (R. 830). Notably, Plaintiff does not dispute that the ALJ reasonably concluded at Step 2 of the analysis that his osteoporosis was a non-severe impairment that did not impose more than minimal work-related functional limitations. (R. 270).

Contrary to Plaintiff's assertion, moreover, Dr. Brandt did not opine that Plaintiff had difficulty concentrating due to medication side effects. (Doc. 18, at 14-15; Doc. 27, at 8-9). The doctor merely observed that Plaintiff's medications "*can* cloud mentation and level of alertness." (R. 830) (emphasis added). Yet Plaintiff never reported to his treaters that he was unable to focus or stay on task due to his medications. Plaintiff did state in a February 20, 2015 Function Report that his medications caused weight gain, swelling, brittle bones, and a rash (R. 583), but there is no evidence in the record that he ever complained of those problems either. As for Dr. Brandt's opinion that physical work would be dangerous for Plaintiff because "weakened bone is prone to pathological fractures" (R. 830), Plaintiff fails to identify a single medical record indicating that his bones were brittle, or point to any treater who suggested Plaintiff limit his activity due to a potential for fractures. Though Plaintiff slipped and fell on ice on January 4, 2014 (R. 650), fell again on January 30, 2014 (R. 765), and was in a car accident on March 18, 2015 (R. 935), the only bone he ever broke was a rib on June 19, 2013. (R. 663, 665).

After rejecting Dr. Brandt's opinion, the ALJ reasonably afforded great weight to the May 28, 2015 opinion from State agency consultant Jeffrey Merrill, M.D. Dr. Merrill opined that Plaintiff could: occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand, walk, and sit for 6 hours in an 8-hour workday; push and pull without limitation; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; and occasionally kneel, crouch, and crawl. (R. 177-78). Plaintiff also needed to avoid concentrated exposure to extreme cold, extreme heat, and vibrations. (R. 179). The ALJ adopted this RFC, finding that Dr. Merrill's opinion was

consistent with the medical records and noting that he has specific program knowledge. (R. 272, 276). Plaintiff does not challenge this aspect of the ALJ's decision.

Viewing the record as a whole, the ALJ's decision to give Dr. Brandt's opinions regarding Plaintiff's back, leg, shoulder, and foot pain no weight is supported by substantial evidence. The ALJ perhaps could have provided a more thorough analysis, but substantial evidence is not a high hurdle to clear, *Bruno*, 817 F. App'x at 241, and the ALJ provided enough of a logical bridge between the evidence and her conclusion to allow for meaningful review. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) (articulation errors are "subject to harmless-error review, and we will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same.").

### 3.    Plaintiff's Subjective Statements

Plaintiff next argues that the Appeals Council erred in accepting the ALJ's evaluation of his subjective statements regarding the nature and limiting effects of his impairments. (R. 5). The Court already determined that the ALJ (and by extension the Appeals Council) reasonably discounted Plaintiff's testimony as it relates to his need for bathroom breaks. Here the Court considers whether the ALJ and the Appeals Council fairly rejected Plaintiff's other complaints of musculoskeletal pain, medication side-effects, and difficulties functioning. As noted earlier, an ALJ's assessment of a claimant's subjective statements will be overturned only if it is "patently wrong." *Summers*, 864 F.3d at 528.

Like the ALJ, the Appeals Council first concluded that Plaintiff's statements were inconsistent with the medical record showing a "routine, conservative course of treatment"

during the relevant period.  (R. 5).  On April 1, 2013, Nasreen Ansari, M.D. diagnosed Plaintiff with osteoporosis and back pain and prescribed Fosamax, Norco, and Xanax. (R. 744-45).  Follow-up exams on April 24 and May 22, 2013 were largely normal but Dr. Ansari referred Plaintiff to a pain clinic for his back.  (R. 747-51).  On June 20, 2013, Plaintiff went to the Adventist ED due to a trunk-chest injury he suffered the previous day. On exam he exhibited normal range of motion and normal strength, but moderate tenderness over his ninth and tenth ribs.  He was diagnosed with a closed rib fracture and discharged in stable condition with a prescription for Norco.  (R. 273, 664-65).

Plaintiff saw Dr. Ansari again on September 26, 2013 for a sinus infection, and on October 31, 2013 for a follow-up on blood test results.  Both times physical exams were normal.  (R. 757-58, 760).  On January 5, 2014, Plaintiff returned to the Adventist ED with lower back and gluteal pain after he slipped and fell on the ice the previous day.  He complained that the fall aggravated his back pain, but an exam documented normal range of motion, normal strength, no tenderness, and no swelling.  (R. 273, 652).  An X-ray of the lumbar spine taken that day showed mild anterior wedging of L4 with ventral spur formation.  (R. 273, 653).  An X-ray of the knee showed no acute fracture, moderate joint effusion, and degenerative changes of the knee.  (R. 273, 654).  Plaintiff was discharged in stable and improved condition with a diagnosis of right hip contusion, hamstring strain, knee effusion, and lumbar strain, and a prescription for Flexeril.  (R. 273, 657).

When Plaintiff saw Dr. Ansari on January 9, 2014, he reported that the Flexeril was not helping his pain.  Dr. Ansari assessed bruising due to the fall and told Plaintiff to try Soma.  (R. 763).  Plaintiff started treating with Nurse Garcia on January 31, 2014.  He reported falling again the previous day, was using a walker, and complained of pain and

muscle spasms.  A physical exam, however, was largely normal except for tenderness in the right upper leg.  (R. 765).  Nurse Garcia diagnosed myalgia and myositis and instructed Plaintiff to take Flexeril and Soma.  (R. 766).  Plaintiff was still experiencing muscle spasms in his right leg, worse at night, when he saw Nurse Garcia on March 7, 2014.  He was walking better but using a walker at times and complained of back pain. (R. 770).  On exam, Nurse Garcia observed swelling in the upper part of the right leg.  (R. 771).

Plaintiff continued to complain of muscle spasms in his right leg on April 2, 2014. At an appointment with Liza Ortiz, M.D. that day, he exhibited a gait problem and Dr. Ortiz assessed myalgia and myositis.  (R. 773).  On April 8, 2014, Plaintiff saw Michael S. Pinzur, M.D., a reconstructive surgery/foot and ankle surgery specialist.  He complained of radiating pain and had very limited spine motion on exam.  Dr. Pinzur recommended that Plaintiff see a spine specialist.  (R. 273, 819-20).  At a follow-up appointment with Nurse Garcia on June 9, 2014, Plaintiff reported numbness and tingling in his feet for the prior six months and pain in his knees and ankles.  He reported that another unidentified doctor had given him Lyrica for the numbness and tingling.  On exam, Plaintiff exhibited tenderness in both knees and ankle, as well as decreased range of motion and tenderness in the lumbar spine.  (R. 777).  Nurse Garcia prescribed tramadol for the back pain and instructed Plaintiff to return in two months.  (R. 778).

On July 2, 2014, Plaintiff saw neurosurgeon Wael Hassaneen-Mostafa, M.D. regarding his lower back pain.  Plaintiff complained of pain all over his joints and exhibited decreased sensation in both feet.  Dr. Hassaneen-Mostafa instructed him to get a CT of the lumbar spine.  (R. 274, 810-11).  The following month on August 11, 2014, Plaintiff

told Nurse Garcia that he was still suffering from chronic low back pain radiating down the right leg, cramping in the calf, and peripheral neuropathy. He exhibited decreased range of motion and tenderness in his back and said he was getting evaluated for an epidural injection. (R. 781). Plaintiff saw pain management specialist Dr. Buck on August 15, 2014 due to lumbar pain lasting eight months. (R. 800). On exam, he exhibited normal gait and full strength in the arms and legs, but a straight leg raise test was positive on the right, and he had decreased sensation in his feet and pain in the lumber spine on flexion and extension. (R. 804). Plaintiff was instructed to return "in the near future" for an epidural steroid injection. (R. 800, 805).

After an August 28, 2014 EMG produced an abnormal study most consistent with polyneuropathy (R. 274, 822), Plaintiff saw Asterios Tsimpas, M.D. and Angela Smolenski, APN regarding his lower back pain and radicular leg pain on September 3, 2014. An exam showed normal gait and minimal difficulty with tandem gait, but Plaintiff did have decreased sensation to light touch in his right foot and calf, and a straight leg raise test was positive bilaterally. (R. 794-95, 859). An X-ray of the lumbar spine taken that day showed stable alignment; mild degenerative changes and very slight joint space narrowing at L5-S1; and mild anterior wedging of L4 vertebral body which appears chronic. (R. 274, 796). A subsequent October 13, 2014 CT of the lumbar spine showed mild to moderate chronic L4 superior endplate compression deformity with large Schmorl's node, as well as very mild chronic central L1 superior endplate compression deformity, and bilateral L5 spondylolysis. (R. 274, 875-76). A physical exam documented normal gait, normal range of motion with some pain, and normal strength, but decreased reflexes, weak pulses in the feet and legs, a positive straight leg raise test on the right,

and tenderness in the sacroiliac ("SI") joint on the right. (R. 274, 874-75). After reviewing the CT results, Dr. Buck administered a lumbar interlaminar epidural steroid injection ("LIESI"). (R. 870).

The following month on November 10, 2014, Plaintiff told Nurse Garcia that he achieved only minimal relief following the injection and reported waking up with generalized pain each day. Norco did not help and Soma helped only "some." (R. 838). On exam, Plaintiff tested positive for back pain and arthralgias. (R. 839). Shortly thereafter on December 8, 2014, Dr. Buck administered a second LEISI. (R. 888). A physical exam showed normal gait and strength, and normal range of motion with some pain, but Plaintiff's reflexes in both legs were decreased (1/4), the pulses in his feet and legs were weak (1/4), and he had positive straight leg raise and Faber's tests on the right. (R. 274, 886-87). Plaintiff continued to complain of back pain when he saw Nurse Garcia on February 24, 2015, and at an appointment with Dr. Buck on March 13, 2015. Plaintiff reported only 50% relief for two weeks after the previous injection, with pain radiating to his right buttocks and down the back of the leg into his feet, and numbness in the feet. (R. 1100). On exam Plaintiff once again had normal gait and strength, and normal range of motion but with pain. Straight leg raise and Faber's tests were positive, he had tenderness in the SI joint on the right, and he exhibited decreased reflexes in the legs and weak pulses in the feet and legs. (R. 275, 1103-04). Dr. Buck administered a third LEISI. (R. 935, 1105).

On March 24, 2015, Plaintiff told Nurse Garcia that he had been in a car accident on March 8 which exacerbated his chronic low back pain. He also developed left shoulder pain and decreased range of motion, along with tenderness in the left shoulder, the

thoracic back, and the lumbar back. (R. 935-36). Nurse Garcia instructed Plaintiff to take tramadol and Robaxin for the pain. (R. 937). Plaintiff was still complaining of left shoulder pain on April 13, 2015. Nurse Garcia noted that Plaintiff exhibited decreased range of motion and crepitus in his left shoulder. (R. 942). At a follow-up appointment with Nurse Garcia on June 17, 2015, Plaintiff reported chronic knee pain with swelling that was exacerbated by walking, standing, and kneeling. (R. 948). Nurse Garcia noted swelling, effusion, tenderness, and crepitus in the left knee. (R. 949). On August 17, 2015, five days after Plaintiff became eligible for disability benefits, he had an injection in his left knee. (R. 1108).

Plaintiff argues that the Appeals Council improperly characterized this treatment as conservative, noting his willingness to take strong medications for pain. (Doc. 18, at 17; Doc. 27, at 11-12) (citing *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014) ("[A] claimant's election to undergo serious treatment, such as having surgery and taking 'heavy doses of strong drugs,' indicates that the claimant's complaints of pain are likely credible.")). It is true that aside from a successful hernia repair, Plaintiff never had any surgeries or other invasive treatments during the relevant period. (R. 275). *See Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (epidural steroid injections "have been characterized as 'conservative treatment.'"). But Plaintiff was routinely prescribed the narcotic pain medicine Norco, something the ALJ completely ignores. The use of strong pain medication can "run counter to an ALJ's conclusion that a claimant only received conservative care." *Harper v. Berryhill*, No. 16 C 5075, 2017 WL 1208443, at *3 (N.D. Ill. Apr. 3, 2017) (citing *Solleveld v. Colvin*, No. 12 C 10193, 2014 WL 4100138 (N.D. Ill. Aug. 20, 2014) ("Although in some cases conservative treatment may contradict the severity

of the limitations alleged, here the record shows that Solleveld was prescribed narcotics, including Vicodin and Norco, numerous times over her treatment history."). That is especially true here where Plaintiff consistently complained of pain to his physicians, who agreed that a narcotic pain reliever was appropriate. *See Reyes v. Colvin*, No. 15 C 10134, 2016 WL 6217090, at *13 (N.D. Ill. Oct. 25, 2016) ("[T]he fact that physicians were willing to prescribe [the plaintiff] strong pain medication indicates that they likely believed his allegations of pain to be credible."). The Norco use may not be sufficient to show disability, but the ALJ needed to address it.

The ALJ also mischaracterized some of the medical evidence. For example, she failed to acknowledge examinations showing that while Plaintiff had normal range of motion, he consistently reported pain with the movement. In addition, the ALJ indicated that Plaintiff's reflexes were normal until March 2015 (R. 274-75), but he actually presented with decreased reflexes and weak pulses in his feet and legs from October 2014 onward. And while the ALJ acknowledged the positive straight leg tests, she never mentioned the positive Faber's tests. The ALJ also does not explain her repeated and seemingly contradictory assertion that Plaintiff showed "mostly intact objective findings such as normal gait, coordination, range of motion, strength, reflexes, and sensation with the exception of antalgic gait, decreased sensation in his left calf and foot, tenderness and swelling in his right hip and left knee, decreased range of motion in his shoulders and lower back, positive straight leg raise, and tenderness in his lower back, knees, and ankles." (R. 275, 276, 277, 278).

Also troubling is the ALJ's reliance on Plaintiff's activities of daily living in discounting his complaints of pain without addressing evidence that those activities were

limited and adjusted around his impairments. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). The ALJ noted that Plaintiff could drive, exercise by walking in his house, shop, attend church, perform personal care tasks, cook, complete laundry, and socialize. (R. 276). Yet the ALJ said nothing about Plaintiff's statements that he did not shower or walk often and did not keep up with his personal hygiene (R. 556); his family members helped with household chores (R. 578), he could not shovel snow (R. 65); he only did small loads of laundry each time (R. 67-68); he tried not to carry groceries (R. 68-69); and he only did 10 minutes of dishes. (R. 70). As a result, the Court cannot determine whether the ALJ considered the evidence and, if so, why she rejected it.

Finally, it is not at all clear that Plaintiff's condition was "stable" as the ALJ stated. (R. 275). She cites four records in support of this assertion: (1) a January 5, 2014 observation that Plaintiff's pain decreased to 2/10 after his slip and fall and he was released from the ED in improved and stable condition (R. 656-57); a June 2013 ED note indicating that Plaintiff was stable following his rib fracture (R. 665); an October 13, 2014 CT scan of the lumbar spine indicating that Plaintiff's multilevel spondylosis appeared stable (R. 876); and a January 13, 2016 evaluation for physical therapy well after Plaintiff started receiving disability benefits in August 2015. (R. 1124). Notes indicating that Plaintiff was discharged from the ED in stable condition on two occasions, and that a CT scan was stable, does not indicate that all of his conditions were stable or controlled.

Viewing the record as a whole, the ALJ "should have developed a more fulsome record about [Plaintiff's] testimony of pain before discounting it; a fuller record may have revealed evidence supporting or refuting [Plaintiff's] claims." *Akin v. Berryhill*, 887 F.3d

314, 318 (7th Cir. 2018).  Plaintiff's request to remand the case for further discussion of this issue is granted.

### 4. Available Jobs

The Court finally addresses Plaintiff's argument that the Appeals Council erred in concluding that there were a significant number of jobs Plaintiff could perform between March 5, 2013 and August 12, 2015.  The Appeals Council and the ALJ determined that a person with Plaintiff's background and RFC could work as an assembler of electrical accessories (5,500 jobs), a switch assembler (4,500 jobs), or a small product assembler (17,000 jobs).  (R. 6, 279).  Plaintiff objects that 27,000 total jobs available in the national economy falls short of the "significant number" required to satisfy Step 5 of the sequential analysis.  (Doc. 18, at 21-22; Doc. 27, at 15-16).

The Seventh Circuit "has not affirmatively established the threshold for the number of jobs in the national economy that qualifies as significant."  *John C. v. Saul*, No. 4:19-CV-04111-SLD-JEH, 2021 WL 794780, at *5 (C.D. Ill. Mar. 2, 2021).  In *Weatherbee v. Astrue*, 649 F.3d 565 (7th Cir. 2011), the court found that "140,000 representative jobs in the national economy was 'well above the threshold for significance,' but did not definitively identify an actual threshold."  *Zych v. Comm'r of Soc. Sec.*, No. 1:20-CV-00414-SLC, 2021 WL 5319880, at *3 (N.D. Ind. Nov. 16, 2021) (quoting *Weatherbee*, 649 F.3d at 572).  In *Primm v. Saul*, 789 F. App'x 539 (7th Cir. 2019), the court similarly concluded that 110,000 in the national economy was a significant number.  *Id*. at 546.  But *Primm* relied on *Liskowitz v. Astrue*, 559 F.3d 736 (7th Cir. 2009), which addressed regional rather than national numbers.  *Id*. at 743 (40,000 jobs in the Milwaukee area was a significant number).

As the *Zych* court pointed out, "'[D]istrict courts within the circuit—applying national numbers—have found as many as 120,350 jobs to not meet the burden, and as few as 17,700 jobs to be significant.'"  2021 WL 5319880, at *4 (quoting *Angela L. v. Saul*, No. 1:20-CV-00481-SEB-DML, 2021 WL 2843207, at *5 (S.D. Ind. July 7, 2021)).  *Compare Sally S. v. Berryhill*, No. 2:18-CV-460, 2019 WL 3335033, at *11 (N.D. Ind. July 23, 2019) (120,350 jobs nationally is not a significant number), *James A. v. Saul*, 471 F. Supp. 3d 856, 859-860 (N.D. Ind. 2020) (14,500 jobs available in the national economy not a significant number), *John C.*, 2021 WL 794780, at *5) (20,000 jobs nationally not a significant number), *Ellis v. Kijakazi*, __ F. Supp. 3d __, 2021 WL 3514701, at *6 (E.D. Wis. Aug. 9, 2021) (14,500 jobs available nationally was not a significant number), and *Gass v. Kijakazi*, No. 2021 WL 5446734, at *8 (N.D. Ind. Nov. 22, 2021) (24,000 jobs available nationally was not a significant number) *with Dorothy B. v. Berryhill*, No. 18 C 50017, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (17,700 jobs nationally is a significant number), *Iversen v. Berryhill*, No. 16 C 7337, 2017 WL 1848478, at *5 (N.D. Ill. May 8, 2017) (30,000 jobs in the national economy was a significant number; *Joseph M. v. Saul*, No. 18 C 5182, 2019 WL 6918281, at *17 (N.D. Ill. Dec. 19, 2019) ("positions account[ing] for 40,000 jobs nationally" qualified as a significant number), *Zych*, 2021 WL 5319880, at *5 (41,000 jobs nationally was a significant number), *Knapp v. Saul*, No. 1:20-CV-00011-PPS-SLC, 2021 WL 536121, at *4-5 (N.D. Ind. Jan. 27, 2021) (67,500 jobs nationally was a significant number), and *Engel v. Kijakazi*, No. 20 C 1206, 2021 WL 4843871, at *12 (E.D. Wis. Oct. 18, 2021) (23,000 jobs constitutes a significant number in the national economy).

Since the case is being remanded on other grounds, the Court need not decide whether 27,000 jobs in the national economy qualifies as significant. However, the Court reminds the Commissioner that it is her burden at Step 5 to show that jobs exist in significant numbers in the national economy that Plaintiff can perform. On remand, the Commissioner should clarify her position and explain why 27,000 national jobs is sufficient.

## **CONCLUSION**

For reasons stated above, Plaintiff's request to reverse the ALJ's decision is granted, and the Commissioner's Motion for Summary Judgment [24] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: December 22, 2021

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge